UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROOCHI TRADERS INCORPORATED,

    *Plaintiff,*

  -against-

TIP TOP TEES INC., GLAMOUR LINE INC., GLAMOUR (USA), INC., ALPHA MERCHANDISING CORP., ROSE DEAL, INC., HARYASH PAUL, MOHAMMED RAHMAN, MOHAMMED FAROQUE, JOHN DOES 1-10, JANE DOES 1-10, and XYZ COMPANIES 1-10,

    *Defendants.*

---

CIVIL ACTION NO. 08-cv-3544 (WHP)

REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR AN ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION

Plaintiff Roochi Traders Incorporated ("Plaintiff" or "Roochi") hereby submits its Memorandum of Law in support of its Motion for an Order to Show Cause for Preliminary Injunction as against Defendants Tip Top Tees Inc., Glamour Line Inc., Alpha Merchandising Corp., Rose Deal, Inc., Haryash Paul, Mohammed Rahman, Mohammed Faroque, John Does 1-10, Jane Does 1-10, and XYZ Companies 1-10 (collectively, "Defendants") based on an action for trademark counterfeiting, trademark infringement, racketeering activities, unfair competition, false designation of origin arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984) and the Anti-Counterfeiting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996) (the "Lanham Act") and for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act as well as trademark infringement, unfair competition, dilution and deceptive acts and practices under the laws of the State of New York.

**PRELIMINARY STATEMENT**

Without Plaintiff's consent or authorization, Defendants, offer for sale, sell and ship t-shirts bearing counterfeits of Plaintiff's registered trademark (the "Counterfeit Products"). On April 18, 2008, Plaintiff executed the Court's April 11, 2008 Temporary Restraining and Seizure Order, as amended on April 14, 2008 (the "Order"), and discovered some 90 dozen of the Counterfeit Products, notably after Haryash Paul, the principal of Defendants Tip Top Tees Inc., Glamour Line Inc., Alpha Merchandising Corp. (collectively referred to as the "Paul-Defendants") denied, in front of multiple witnesses, having any COTTON HERITAGE branded shirts on the premises. Mr. Paul then changed his story, stating that the shirts were purchased from Plaintiff themselves, and providing counsel and the investigator an old 2006 invoice. In opposition to this action, the story has changed yet again, more complicated but confirming that the Paul Defendants knowingly purchased COTTON

HERITAGE shirts from Defendant Rose Deal, Inc., a source not authorized to sell or import COTTON HERITAGE branded shirts.

More concerning yet is that Mr. Paul in his own declaration, evidences his intention to keep distributing the Counterfeit Products throughout the U.S., apparently because he is in possession of additional inventory of the shirts. *See* Declaration of Haryash Paul ¶ 12, dated April 28, 2008, ("Paul Decl.") Moreover, Mr. Paul is once again boasting to third parties that Plaintiff's action against him and his companies will fail because only 90 dozen counterfeit t-shirts were seized. *See* Declaration of Sajid Ali ¶ 7, dated April 30, 2008, ("Ali Decl."). The Paul-Defendants brazenly continue to offer for sale, sell and ship Counterfeit Products throughout the U.S., including New York, in contempt of the Order.

Mr. Paul's utter disregard for this Court's April 11, 2008 Order further supports the necessity of keeping the Order in place, specifically Section C of the requested preliminary injunction set forth therein, restraining Defendant's assets so that Plaintiff's right to an equitable accounting of Defendant's profits from sales of the Counterfeit Products is not impaired. The Second Circuit provides for such relief to ensure the availability of an equitable accounting. Further, the current asset restraint protects the rights of all parties. Notably, the Order provides Defendants with the right (1) to seek a modification on telephonic notice, and (2) to make certain personal and/or business payments. Although Plaintiff's counsel moved swiftly to serve notice on all banks with which the Paul-Defendants had accounts, it was only able to restrain one bank account out of several. *See* Declaration of Mimi K. Rupp ¶ 3, dated April 30, 2008. The Paul-Defendants had several accounts at J.P. Morgan Chase ("Chase"). *Id.* However, less than 24 hours after Roochi executed the seizure order, the Chase accounts were literally drained or closed. *Id.* Without the restraint in place, there will be no remedy for Plaintiff because the solitary account subject to restraint would be drained as

quickly as the Paul-Defendants' Chase accounts were. The asset restraint order is crafted judiciously to protect the rights of all parties.

## FACTUAL BACKGROUND

### A. Inspection of the Counterfeit Product

On April 28, 2008, at counsel's office, Mr. Ali personally examined the counterfeit COTTON HERITAGE t-shirts (the "Counterfeit Products") that were seized at the Paul Defendants' premises on April 18, 2008. Ali Decl. ¶ 3. Upon examination of the inside label, it identifies a purchase order number "1927" and a factory number "8". *Id.* Factory 8 is Humatnoor Knitwear (Pvt.) Ltd. ("Humatnoor"), owned on information and belief, by Mohammed Ataur Rahman of Rose Deal, Inc., two of the named Defendants in this action *Id.*

The purchase order number (No. 1927) corresponds to an order Plaintiff cancelled in April of 2007, over a year ago and Factory 8 had been terminated in July 2007. *Id.* Further, the plastic bag wrapping the Counterfeit Products listed a style number discontinued by Roochi (M1010118R) *Id.*

Paul-Defendants assert that Plaintiff cannot prove that the Counterfeit Products originated from Defendant Rose Deal, Inc. while at the same time stating that he obtained the shirts that were seized and more from Rose Deal, Inc.: "There is absolutely no evidence to prove that what was inside any of the [Rose Deal boxes] was actually allegedly counterfeit merchandise, as opposed to Rose Deal, Inc.'s own, legitimate product [shirts bearing the ROSE DEAL label]." (Paul-Defendants' Memo at 3). To the contrary, the Counterfeit Products have been consistently found in ROSE DEAL boxes and the likely unauthorized manufacturer in Bangladesh is Humatnoor, owned by Mr. Rahman of Rose Deal, Inc. The t-shirts seized from the Paul-Defendants on April 17, 2008 are Counterfeit Products based on the following evidence: (i) the purchase order (No. 1927) had been cancelled over a year ago; (ii) to our knowledge no t-shirts were manufactured or authorized to be manufactured under purchase order No. 1927; (iii) Roochi has not authorized the manufacture of any of its goods at

3

Factory 8 for nearly a year; (iv) Roochi is the only entity authorized to manufacture and import COTTON HERITAGE t-shirts into the United States, a fact widely known in the industry and to the Paul-Defendants, a former customer of Roochi; (v) Defendant Rose Deal is not an authorized importer or seller of COTTON HERITAGE t-shirts; (vi) Roochi has no missing orders or inventory; and (vii) the Counterfeit Products do not appear to be manufactured over a year ago. Ali Decl. ¶ 6.

**B.    Roochi Will Suffer Continued Harm if a Preliminary Injunction Against Defendants Is Not Granted**

Without the preliminary injunction, Roochi will suffer losses that cannot be addressed by monetary damages alone. Since the week of March 17, 2008, Roochi has been contacted by numerous distributors and customers who have been asking for a discount price due to the Paul-Defendants flooding the U.S. market from Florida to New York to Ohio with Counterfeit Products, which appear to be selling for $15-18 a dozen which $4-7 less than the price of genuine COTTON HERITAGE t-shirts, a substantial amount when selling 1800 dozen (e.g., a savings of $7,200 - 12,600). Ali Decl. ¶ 7. Many of the Roochi distributors are frustrated because their customers are buying Counterfeit Products from Tip Top Tees under the false assumption that they are purchasing authentic goods. *Id.* On or about the week of April 26, 2008, a distributor told Mr. Ali that Mr. Paul is still selling counterfeit COTTON HERITAGE t-shirts and is boasting that Roochi's case against him will fail since only 90 dozen Counterfeit Products were seized. *Id.* Because of Tip Top Tee's widespread dissemination of Counterfeit Products, relationships with long-standing customers have been destroyed and the goodwill symbolized by Roochi's COTTON HERITAGE has been considerably damaged. *Id.* The continued unchecked distribution of the Counterfeit Products is rapidly reducing the value of the COTTON HERITAGE mark, which generates $7 million a year in revenue for Roochi.

When Plaintiff's investigator confronted Mr. Paul with the counterfeit COTTON HERITAGE t-shirts discovered in his showroom during the April 17, 2008 seizure, Mr. Paul stated that he bought

4

the shirts from Roochi, waving a receipt dated 2006. Declaration of Stephen G. Ward ¶ 5, dated April 30, 2008 ("Ward Decl."). However, Roochi did not sell the Counterfeit Products to Mr. Paul. Ali Decl. ¶ 8.

Mr. Paul's fall back explanation that he bought the Counterfeit Products seized on April 17, 2008 from ALM General Trading, Inc. ("ALM") is similarly untrue. It is, at best, highly unlikely because it does not make any financial sense for ALM to sell a dozen t-shirts it purchased from Roochi at $$19-20 a dozen to the Paul-Defendants, who are selling counterfeit COTTON HERITAGE t-shirts for $$15-18 a dozen. Ali Decl. ¶ 9. Moreover, the Counterfeit COTTON HERITAGE t-shirts seized on April 17, 2008 were in Rose Deal, Inc. boxes. ALM would not likely ship its product in such boxes but further discovery is necessary to confirm this face. *Id.*

A day after Roochi's counsel executed the seizure order, on or about April 18, 2008, Mr. Ali met with Mohammed Ataur Rahman of Rose Deal, Inc. and Humatnoor to discuss the seizure of Mr. Paul's Counterfeit Products. *Id.* at ¶ 11. Mr. Rahman told Mr. Ali that if Roochi got "out of hand" with its legal action against Mr. Paul over the Counterfeit Products, he informed Mr. Ali that anything could happen to Roochi management while they are in Bangladesh. *Id.* When Mr. Ali asked Mr. Rahman to clarify what he meant by "anything could happen," Mr. Rahman told Mr. Ali that as a foreigner in Bangladesh anyone could do anything they wanted to such a foreign without anyone noticing. *Id.* Mr. Ali understood this to be a physical threat. *Id.*

The apparent source of the Counterfeit Product for the Paul-Defendants is Rose Deal, Inc. – however, the nature of the relationship between the Paul- Defendants and Rose Deal, Inc. has not been fully uncovered. It is highly likely that Mr. Rahman and Mr. Paul are acting in concert to manufacture the Counterfeit Products at Mr. Rahman's Factory 8 and funnel the Counterfeit Products through Mr. Rahman's Rose Deal, Inc., using the cancelled purchase order number to ensure that the Counterfeit Products have the patina of legitimacy. Since there is evidence that Defendants continue

to import, distribute and sell the Counterfeit Products, Roochi is considering a motion for contempt if more facts surface to confirm the sales. Rose Deal, Inc. was served on April 22, 2008; however, to date, it has failed to respond, notwithstanding Mr. Rahman's knowledge of the lawsuit and subsequent threat to Plaintiff which was conveyed to Mr. Ali on April 18, 2008.

## ARGUMENT

I.     **PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION**

    A.     **Plaintiff Is Entitled To A Preliminary Injunction**

In this Circuit, preliminary injunctive relief is available upon a showing of (a) likely irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits, coupled with a balance of hardships tipping decidedly in the movant's favor. *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994); *Firma Melodiya v. ZYX Music GmbH*, 882 F.Supp. 1306, 1311 (S.D.N.Y. 1995).

The record in this case amply supports Plaintiff's request for injunctive relief under either test.

    1.     **Plaintiff Will Suffer Irreparable Harm If Defendants Are Not Preliminarily Enjoined**

The probability of public confusion as to the source or sponsorship of Defendants' Counterfeit Products is, itself, irreparable harm. *Church of Scientology Int'l. v. Elmira Mission,* 794 F.2d 38, 41 (2d Cir. 1986). Thus, the right to a preliminary injunction follows from a *prima facie* showing of plaintiff's likelihood of success on the merits of its trademark claims. *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F. Supp. 980, 990 (S.D.N.Y. 1980)

> There is no question that irreparable harm would result from a failure to enjoin if the plaintiff ultimately succeeds on the merits." *Amer. Home Products v. Johnson Chemical Co.,* 589 F.2d 103, 106 (2d Cir. 1978).

This is because a trademark owner has the right to control the use of its trademark and the goodwill that its trademark symbolizes. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259-60 (2d Cir. 1987). This Court has held that, with respect to trademark infringement claims,

6

"irreparable harm may be presumed upon a showing that [plaintiff's] trademark is protectable and that a likelihood of confusion exists as to the ownership or source of goods in question." *Firma Melodiya*, 882 F. Supp. at 1311.

Plaintiff will be irreparably harmed by Defendants' continued sale of their Counterfeit Products. *See Firma Melodiya*, 882 F. Supp. at 1311.

The sale of Counterfeit Products bearing Plaintiff's Trademark is causing irreparable harm to Plaintiff. Because counterfeit COTTON HERITAGE t-shirts are of less or unknown quality and are substantially less expensive than genuine COTTON HERITAGE t-shirts, the sale of the Counterfeit Products is savaging a brand that generates over $7 million a year.

### 2. Plaintiff Is Likely To Succeed On The Merits

In order to prevail on its claims for trademark infringement and counterfeiting, and unfair competition under the Lanham Act and at common law, Plaintiff must prove, *inter alia*: (1) Plaintiff's Trademark is entitled to protection; and (2) there is a likelihood of confusion between Defendants' Counterfeit Products and Plaintiff's Trademark as used or intended to be used in the marketplace. *See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 489-90 (2d Cir. 1988)

The record submitted in support of this application plainly shows that Plaintiff should prevail on both of these points.

#### a. Ownership

There is no dispute that Plaintiff is the exclusive owner of the trademark that is the subject of this action and that this mark is distinctive. Plaintiff's evidence amply demonstrates a likelihood that it will prevail on this first element of its claims for trademark counterfeiting and infringement, and unfair competition under the Lanham Act and at common law.

### b.     Likelihood Of Confusion

Standing alone, Defendants' importation, distribution, offering for sale and sale, of t-shirts bearing Plaintiff's Trademark that do not originate with and are not authorized by Plaintiff, establishes Plaintiff's likelihood of success on the merits and right to preliminary injunctive relief. *Power Test Petroleum Distribs. v. Calcu Gas,* 754 F.2d 91, 94-95 (2d Cir. 1985). Moreover, a person who reproduces and uses a plaintiff's registered trademark in commerce on the same goods sold by the plaintiff without consent of the registrant shall be liable for infringement where, as in this case, confusion necessarily results. *Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.,* 714 F. Supp. 78, 79 (S.D.N.Y. 1989). Despite having backrooms filled with other apparently counterfeit goods (e.g., COACH, DOLCE AND GABBANA, and G-UNIT) (Ward Decl. ¶ 8) in addition to counterfeit COTTON HERITAGE products, the Paul-Defendants attempt to cloak their acts in a clumsily crafted innocent purchaser defense. The Paul-Defendants seem truly unaware that Courts in this district have uniformly rejected such a defense on its face. *See Cartier Int'l B.V. v. Ben-Menachem,* No. 06-CV-3917 (RWS), 2007 U.S. Dist. LEXIS 95366 (S.D.N.Y. Jan. 3, 2008) (holding defendants were liable for trademark counterfeiting and infringement because sellers bear strict liability, "even an 'innocent' individual who sells [counterfeit or infringing] goods . . . . [regardless of] whether or not the person against whom relief is sought knew such mark was so registered."); *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F. Supp. 1060 (S.D.N.Y. 1991) (same; ". . . plaintiffs are entitled to relief even against a totally innocent infringer."). Mr. Paul, as an admitted former customer of Roochi, knew that the COTTON HERITAGE mark was exclusive to Plaintiff and accordingly bad faith may be inferred. *Gucci America,* 759 F. Supp. at 1065. Plus, even parties who once had authority to use the mark are counterfeiters if they continue to use the mark after authorization was terminated. *See, e.g., U.S. v. Bohai Trading Co.,* 45 F.3d 577 (1st Cir. 1995); *see also Liz Clairborne, Inc. v. Mademoiselle Knitwear, Inc.,* 13 F.Supp.2d 430 (S.D.N.Y. 1998).

### 3. The Balance of Hardships Tips Decidedly in Plaintiff's Favor

Plaintiff has established the requisite likelihood of success as to Defendants' liability for trademark counterfeiting and infringement under the Lanham Act, as well as Plaintiff's related state claims. As discussed, *supra,* Plaintiff will suffer irreparable harm to its Trademark, to its reputation and to its goodwill if Defendants are not enjoined. On the other hand, Defendants will not suffer any harm which should be considered in deciding whether to award preliminary injunctive relief. Defendants have no legitimate business interest in the importation, distribution, offering for sale and sale of Counterfeit Products. Their present "predicament is of [their] own making." *Syntex Labs., Inc. v. Norwich Pharmacal Co.,* 315 F. Supp. 45, 57 (S.D.N.Y. 1970).

As set forth in greater detail above, the harm to Plaintiff is irreparable. The continued unauthorized use of the Plaintiff's Trademark further threatens Plaintiff's reputation because Plaintiff will lose control over the quality and appearance of its products, which will ultimately destroy the value of Plaintiff's Trademark as a designation of source. In stark contrast, the potential harm is exclusively monetary. There is no justification for selling the Counterfeit Product or otherwise using Plaintiff's Trademark without Plaintiff's authorization. Indeed, given "the probable outcome of this action, this is a loss which [defendants] may justifiably be called upon to bear." *Corning Glass Works v. Jeanette Glass Co.,* 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970). The Paul-Defendants can continue to generate substantial cash flow from its legitimate TIP TOP TEES branded t-shirts. Moreover, any revenue generated by the Paul-Defendants can be directed into new or hidden bank accounts.

### II. PLAINTIFF IS ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS

Plaintiff has shown a strong likelihood of succeeding on the merits of its trademark counterfeiting and infringement claims, and thus Plaintiff ultimately will be entitled to an equitable

9

accounting of Defendants' profits from sales of Defendants' Counterfeit Products. 15 U.S.C. § 1117. In the leading case of *Reebok v. Marnatech*, the district court granted Reebok a limited restraint of the defendant's assets for the purpose of preserving same to ensure the availability of a meaningful accounting after trial. *Reebok Int'l Ltd.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992). In determining whether to issue an order restraining a defendant's assets, a plaintiff must show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendant's counterfeit activities; and (3) defendant's might hide its ill-gotten funds if its assets were not frozen. *Marnatech*, 737 F. Supp. at 1524, 1527. As demonstrated above, Plaintiff will likely succeed on the merits of its claims, is incurring irreparable injury, and Paul-Defendants have already drained its Chase accounts and will similarly empty the solitary account that is restrained, rendering an accounting meaningless. Plaintiff respectfully submits that the grant of an injunction restraining the likely transfer of Defendants' assets herein is proper.

## CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests that this Court grant an order to show cause for preliminary injunction.

KENYON & KENYON LLP

Dated: April 30, 2008      By  _____
Michelle Mancino Marsh (MM 1494)
Mimi K. Rupp (MR 0007)
One Broadway
New York, New York 10004
Tel.: (212) 425-7000
*Attorneys for Plaintiff*
Roochi Traders Incorporated