UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROOCHI TRADERS INCORPORATED,

       *Plaintiff*,

    -against-

TIP TOP TEES INC., GLAMOUR LINE INC.,
GLAMOUR (USA), INC., ALPHA
MERCHANDISING CORP., ROSE DEAL,
INC., HARYASH PAUL, MOHAMMED
RAHMAN, MOHAMMED FAROQUE, JOHN
DOES 1-10, JANE DOES 1-10, and XYZ
COMPANIES 1-10,

        *Defendants*.

CIVIL ACTION NO.

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF'S *EX PARTE*
APPLICATION FOR AN ORDER TO
SHOW CAUSE FOR TEMPORARY
RESTRAINING ORDER, SEIZURE
ORDER, ASSET RESTRAINING
ORDER, ORDER FOR EXPEDITED
DISCOVERY AND ORDER TO SHOW
CAUSE FOR PRELIMINARY
INJUNCTION**

**[FILED UNDER SEAL PURSUANT TO
15 U.S.C. § 1116]**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................2

FACTUAL BACKGROUND ....................................................................4

ARGUMENT ...........................................................................9

I.    PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER
      AND PRELIMINARY INJUNCTION..............................................................9

      A.    Plaintiff Is Entitled To A Temporary Restraining Order ....................................10

      B.    Plaintiff Is Entitled To A Preliminary Injunction ..................................10

            1.    Plaintiff Will Suffer Irreparable Harm If Defendants Are Not
                  Preliminarily Enjoined ...........................................................11

            2.    Plaintiff Is Likely To Succeed On The Merits...........................................12

            3.    The Balance of Hardships Tips Decidedly in Plaintiff's Favor ................17

II.   PLAINTIFF IS ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING
      ORDER AND SEIZURE ORDER ........................................................19

III.  PLAINTIFF IS ENTITLED TO AN ORDER PREVENTING THE
      FRAUDULENT TRANSFER OF ASSETS........................................................22

IV.   PLAINTIFF IS ENTITLED TO EXPEDITED DISCOVERY ...........................................24

CONCLUSION.............................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amer. Home Products v. Johnson Chemical Co.,*
589 F.2d 103 (2d Cir. 1978)............................................................................................ 12

*Antik Demin LLC v. Da Urban Hut et al.,*
No. 05 CV 10077 (JFK) (S.D.N.Y. Dec. 12, 2005)........................................................ 22

*Banff, Ltd. v. Federated Dept. Stores, Inc.,*
841 F.2d 486 (2d Cir. 1988)............................................................................................ 13

*Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.,*
714 F. Supp. 78 (S.D.N.Y. 1989) .................................................................................... 14

*Cartier Int'l B.V. v. Sam Liu,*
No. 02 CV 7926, 2003 WL 1900852 (S.D.N.Y. Apr. 17, 2003) .................................... 23

*Cartier Int'l v. Gorski,*
No. 301 CV 1948 (PCD) (D. Conn. Oct. 17, 2001)........................................................ 24

*Cartier v. Symbolix, Inc.,*
2005 WL 1330786 (S.D.N.Y. June 2, 2005) .................................................................. 19

*Church of Scientology Int'l. v. Elmira Mission,*
794 F.2d 38 (2d Cir. 1986)............................................................................................... 11

*Consolidated Cigar Corp. v. Monte Cristi de Tabacos,*
58 F. Supp.2d 188 (S.D.N.Y. 1999)........................................................................... 17, 19

*Corning Glass Works v. Jeanette Glass Co.,*
308 F. Supp. 1321 (S.D.N.Y. 1970)................................................................................. 20

*Edison Bros. Stores, Inc. v. Cosmair, Inc.,*
651 F.Supp. 1547 (S.D.N.Y. 1987) ................................................................................. 16

*Empresa Cubana Del Tabaco v. Culbro Corp.,*
70 USPQ2d 1650 (S.D.N.Y. 2004) ................................................................................. 14

*Fila U.S.A., Inc. v. Eidai Int'l,*
No. CV 93-00837 (D. Haw. Oct. 29, 1995) .................................................................... 23

*Fila U.S.A., Inc. v. Top Luxor Trading,*
No. CV 98-5187 (C.D. Cal. June 29, 1998)..................................................................... 23

*Fimab-Finanziaria Maglificio v. Helio Import/Export*,
    601 F. Supp. 1 (S.D. Fla. 1983) ................................................................................. 29

*Firma Melodiya v. ZYX Music GmbH*,
    882 F.Supp. 1306 (S.D.N.Y. 1995) ................................................................... 11, 12

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
    25 F.3d 119 (2d Cir. 1994) ......................................................................................... 11

*Franchised Stores of N.Y., Inc. v. Winter*,
    394 F.2d 664 (2d Cir. 1968) ....................................................................................... 16

*Fun-damental Too, Ltd. v. Gemmy Industries Corp.*,
    111 F.3d 993 (2d Cir. 1997) ....................................................................................... 18

*Glamorene Prods. Corp. v. Boyle-Midway, Inc.*,
    188 USPQ 145 (S.D.N.Y. 1975) ............................................................................... 15

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
    415 U.S. 423 (1974) .................................................................................................. 10

*Gucci Am., Inc. v. Loehmann's Inc.*,
    No. 01 Civ. 3904 (MBM),
    2001 U.S. Dist. LEXIS 19358 (S.D.N.Y. Nov. 27, 2001) ....................................... 10

*Hanover Star Milling Co. v. Metcalf*,
    240 U.S. 403 (1916) .................................................................................................. 16

*In re Vuitton et Firs S .A.*,
    606 F.2d 1 (2d Cir. 1979) .................................................................................... 10, 25

*Kraft General Foods, Inc. v. Allied Old English, Inc.*,
    831 F.Supp. 123 (S.D.N.Y. 1993). ........................................................................... 16

*Lesportsac, Inc. v. K-Mart Corp.*,
    754 F.2d 71 (2d Cir. 1985) ........................................................................................ 21

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
    51 F.3d 982 (11th Cir. 1995) ............................................................................... 25, 27

*Levitt Corp. v. Levitt*,
    593 F.2d 463 (2d Cir. 1979) ....................................................................................... 26

*Lexington Management Corp. v. Lexington Capital Partners*,
    10 F. Supp.2d 271 (S.D.N.Y. 1998) .......................................................................... 17

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987) ............................................................................... 12, 16

*N.Y. State Soc'y Certified Public Accountants v. Eric Louis Assocs., Inc.*,
    79 F.Supp. 2d 331 (S.D.N.Y. 1999)............................................................ 16

*North Face Apparel Corp. v. Reliance Dep't Store, Inc.*,
    No. 03 CV 9596 (BSJ) (S.D.N.Y. Dec. 3, 2003) ..................................... 23

*North Face Apparel Corp. v. TC Fashions, Inc.*,
    No. 05 CV 9082 (S.D.N.Y. Oct. 25, 2005)............................................... 22

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*,
    175 F.3d 266 (2d Cir. 1999)...................................................................... 13

*Polymer Technology Corp. v. Mimran*,
    975 F.2d 58 (2d. Cir.)............................................................................... 19

*Power Test Petroleum Distribs. v. Calcu Gas*,
    754 F.2d 91 (2d Cir. 1985)........................................................................ 14

*Reebok Int'l Ltd. v. Fairgulf Int'l Shipping & Trading, U.S.A., Inc.*,
    No. 93 Civ. 391 (W.D. Tex. Sept. 28, 1993) ........................................... 24

*Reebok Int'l Ltd. v. Marnatech Enter.*,
    737 F. Supp. 1521 (S.D. Cal. 1989),
    *aff'd* 970 F.2d 552 (9th Cir. 1992)............................................. 23, 25, 26, 27

*Reebok Int'l Ltd. v. McLaughlin*,
    89 Civ. 1739-T (S.D. Cal. Nov. 27, 1989)............................................... 23

*Republic of Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) .................................................................. 26

*Russ Berrie & Co. v. Jerry Elsner Co.*,
    482 F. Supp. 980 (S.D.N.Y. 1980) ........................................................... 12

*Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*,
    217 USPQ 617 (S.D.N.Y. 1982)............................................................... 15

*Syntex Labs., Inc. v. Norwich Pharmacal Co.*,
    315 F. Supp. 45 (S.D.N.Y. 1970) ............................................................. 20

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*,
    749 F. Supp. 473 (S.D.N.Y. 1990) ..................................................... 27, 28

*Warner Bros., Inc. v. Gay Toys, Inc.*,
    724 F.2d 327 (2d Cir. 1983)...................................................................... 17

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*,
    698 F.2d 862 (7th Cir. 1983) .................................................................... 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROOCHI TRADERS INCORPORATED,<br><br>*Plaintiff,*<br><br>-against-<br><br>TIP TOP TEES INC., GLAMOUR LINE INC., GLAMOUR (USA), INC., ALPHA MERCHANDISING CORP., ROSE DEAL, INC., HARYASH PAUL, MOHAMMED RAHMAN, MOHAMMED FAROQUE, JOHN DOES 1-10, JANE DOES 1-10, and XYZ COMPANIES 1-10,<br><br>*Defendants.* | CIVIL ACTION NO.<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR AN ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER, SEIZURE ORDER, ASSET RESTRAINING ORDER, ORDER FOR EXPEDITED DISCOVERY AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**<br><br>**[FILED UNDER SEAL PURSUANT TO 15 U.S.C. § 1116]** |

Plaintiff Roochi Traders Incorporated ("Plaintiff" or "Roochi") hereby submits their Memorandum of Law in support of its *ex parte* Application for a Temporary Restraining Order, Seizure Order, Asset Restraining Order, Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction as against Defendants Tip Top Tees Inc., Glamour Line Inc., Glamour (USA), Inc., Alpha Merchandising Corp., Rose Deal, Inc., Haryash Paul, Mohammed Rahman, Mohammed Faroque, John Does 1-10, Jane Does 1-10, and XYZ Companies 1-10 (collectively, "Defendants") based on an action for trademark counterfeiting, trademark infringement, racketeering activities, unfair competition, false designation of origin arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984) and the Anti-Counterfeiting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996) (the "Lanham Act") and for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act as well as trademark

infringement, unfair competition, dilution and deceptive acts and practices under the laws of the State of New York.

## PRELIMINARY STATEMENT

An illegal billion dollar industry thrives in New York City involving the unlawful manufacture, distribution, offer for sale, and sale of merchandise bearing counterfeits and/or infringing imitations of the trademarks of legitimate manufacturers and distributors. Plaintiff has become a victim of this illegal activity. Without Plaintiff's consent or authorization, Defendants, offer for sale, sell and ship counterfeit t-shirts bearing counterfeits of Plaintiff's registered trademark (the "Counterfeit Products"). Not only are Defendants selling counterfeit versions of Plaintiff's COTTON HERITAGE branded t-shirts at a significantly lower price than the genuine goods, Haryash Paul, the owner of the corporate defendants, boasted to one of Plaintiff's customers that he was underselling Plaintiff, laughing that there was nothing that Plaintiff could do to stop the illegal activity.[1] Defendants are offering for sale, selling and shipping these Counterfeit Products throughout the United States, including New York.

Defendants are not authorized and have never been authorized by Plaintiff or any other party to manufacture, export, import, distribute, offer for sale or sell any goods bearing Plaintiff's COTTON HERITAGE trademark ("Plaintiff's Trademark") or to use Plaintiff's Trademark in any way. Defendant's intentional misconduct is causing, and will continue to cause, irreparable harm to Plaintiff's reputation and goodwill and to Plaintiff's rightful market position. Plaintiff, therefore, respectfully requests that this Court issue: (i) a temporary restraining order and preliminary injunction against Defendant enjoining the manufacture, importation, exportation, distribution, offer of sale and sale or other use of the Counterfeit

---

[1]    *See* Declaration of Sajid Ali ¶ 14, dated April 9, 2008 ("Ali Decl.").

Products; (ii) an order of seizure for the Counterfeit Products to prevent the shipment, transfer or delivery of any Counterfeit Products to unknown third parties; (iii) an order of seizure of Defendants' business records relating to the Counterfeit Products to prevent their destruction; (iv) an order to include restricting transfer of Defendants' assets to preserve Plaintiff's rights to an equitable accounting; and (v) an order for expedited discovery allowing Plaintiff to inspect and copy Defendants' books and records relating to the manufacture, export, distribution, offer of sale and sale of the Counterfeit Products and Defendant's unauthorized use of Plaintiff's Trademark.

Plaintiff requests this relief *ex parte* because experience in other cases has demonstrated that unless such orders are issued *ex parte*, Defendants may quickly dispose of or hide the Counterfeit Products and the business records related thereto and disclaim any knowledge of the source of the Counterfeit Products. In addition, experience in other cases has shown that, without the requested relief, it may be impossible for Plaintiff to track the sources of the Counterfeit Products. Defendants' Counterfeit Products are flooding the marketplace at a substantially lower price causing Plaintiff staggering damages and irreparable harm. Plaintiff's relationships with its authorized distributors of genuine COTTON HERITAGE t-shirts have been deeply compromised because customers are buying the Counterfeit Products from Defendants under the false assumption that they are genuine goods for a substantially lower price. It is vital that Plaintiff find such goods and documents related thereto immediately to minimize certain future irreparable harm.

Additionally, Plaintiff requests an order restraining Defendant's assets so that Plaintiff's right to an equitable accounting of Defendant's profits from sales of the Counterfeit Products is not impaired. The Second Circuit provides for such relief to ensure the availability of an

equitable accounting and issuing the order on an *ex parte* basis will ensure Defendants compliance with the order. Defendants involved in illegal activities of this nature will otherwise ignore orders restraining assets that are issued with prior notice and claim ignorance of their responsibilities while simultaneously transferring funds out of their U.S. bank accounts before an order is issued, thereby rendering a plaintiff's right to an equitable accounting meaningless. Further, Plaintiff's proposed asset restraint protects the rights of all parties. Notably, Plaintiff's proposed order provides Defendants with the right (1) to seek a modification on short notice, and (2) to make certain personal and/or business payments.

Without this requested relief, Defendants' distribution and sale of the Counterfeit Products will irreparably harm Plaintiff because prospective purchasers in the trade and among the general public will believe that Defendants' Counterfeit Products have been manufactured by Plaintiff, when in fact, they have not.

## FACTUAL BACKGROUND

### A.    Plaintiff's Trademark and Products

Plaintiff is a family-owned business that started in 1984. Ali Decl. ¶ 3. Plaintiff has grown into a leading manufacturer and distributor of sportswear and activewear with annual sales of over $30 million. *Id.* Plaintiff has offices in California, New York, Miami and India. Roochi has over 165,000 square feet of warehouse space to accommodate its growing distribution operations. *Id.*

Since 2002, Plaintiff has manufactured, distributed and sold quality t-shirts under its COTTON HERITAGE trademark throughout the United States. *Id.* ¶ 4-5. Plaintiff owns the entire right, title and interest in and to Plaintiff's federally registered Trademark. Complaint Ex. A.

Over the years, Plaintiff has enjoyed success by manufacturing, distributing and selling COTTON HERITAGE t-shirts, which are known for their quality among the trade. Ali Decl. ¶ 4. Plaintiff takes pride in its reputation for fair dealing and material quality, for example, even after many washings, heat transfer printing designs retain integrity and the material resists fading and showing wear. *Id.* As a result of Plaintiff's quality workmanship at a fair value, Plaintiff's COTTON HERITAGE branded t-shirts alone generate over $7 million annually in sales. *Id.*

Plaintiff sells its COTTON HERITAGE branded t-shirts to distributors and wholesalers, who in turn, sell to other distributors or retailers, in bulk amounts, i.e., hundreds of dozens per sale. *Id.* at ¶ 5. Products bearing Plaintiff's Trademark are thus closely associated with Plaintiff's reputation among the trade and the ultimate purchasers. As a result, Plaintiff's Trademark has come to symbolize Plaintiff's goodwill and is an invaluable asset to Plaintiff.

### B.    Defendants' Illegal Activities

Without authorization from Plaintiff, Defendants have imported, distributed, offered to sell and sold their Counterfeit Products under Plaintiff's Trademark. Like Plaintiffs, Defendants are a wholesale distributor of apparel, including t-shirts.

On or about the week of March 17, 2008, Plaintiff's Vice President of East Coast Operations, Sajid Ali ("Ali") contacted a long time customer, West Side Socks Ltd. ("West Side Socks") about its order for COTTON HERITAGE t-shirts. Ali Decl. ¶ 7. Mr. Ali tried to find out why West Side Socks did not follow up with its order for 300 cases (i.e., 1800 dozen t-shirts). *Id.* On or about March 20, 2008, Mr. Ali went in person to West Side Socks' place of business at 25 West 27th Street, New York, New York 10001, because Ali had heard from his other customers that West Side Socks recently purchased an order from a company called Tip

Top Tees for $18 a dozen, which was significantly less than the price of genuine COTTON HERITAGE t-shirts ($$20-22). *Id.* ¶ 5, 8.

While at West Side Socks' place of business, I saw white boxes with the name "ROSE DEAL COTTON-TEES U.S.A." printed on the side. *Id.* ¶ 8. These boxes contained black t-shirts with counterfeit "COTTON HERITAGE" labels. *Id.* The Counterfeit Products that West Side Socks had purchased from Tip Top Tees were of lesser or unknown quality than Roochi's authentic COTTON HERITAGE branded t-shirts. *Id.* The West Side Socks representative told me that when he opened the box only to discover t-shirt with exact copies of Roochi's COTTON HERITAGE label, he was confused why Tip Top Tees was selling COTTON HERITAGE t-shirts. *Id.* ¶ 9. The representative volunteered to give me two representative samples from the Tip Top Tee shipment that came in Rose Deal boxes so that Mr. Ali could determine more closely if the shirts were counterfeit and, indeed, they were. *Id.* On March 25, 2008, Mr.Ali personally delivered the two counterfeit "COTTON HERITAGE" t-shirts obtained from West Side Socks to Mimi Rupp at Kenyon & Kenyon LLP. *Id.* ¶ 16.

Upon closer examination Mr. Ali determined that the stitching on the counterfeit "COTTON HERITAGE" t-shirt is coarse and raised whereas the stitching on the genuine COTTON HERITAGE t-shirt is smooth and flush with the material of the t-shirt. *Id.* at ¶ 10. Mr. Ali examined these shirts and determined that they were counterfeit goods of less or unknown quality. *Id.* The West Side Socks' representative told Mr. Ali that on or about the week of March 17, 2008, an Asian female representative from Tip Top Tees visited his offices and said that she inquired if West Side Socks would like to purchase black t-shirts and West Side Socks ordered 150 boxes of black t-shirts (900 dozen) from Tip Top Tees, which West Side Socks pre-sold to a customer. *Id.* ¶ 11-12.

On or about March 21, 2008, when Mr. Ali returned to West Side Socks' place of business at 25 West 27th Street, he saw a truck from Gold Trucking delivering boxes to West Side Socks. *Id.* ¶ 13. The words "ROSE DEAL COTTON-TEES U.S.A." were displayed on the side of each box. *Id.* Mr. Ali recognized these boxes from the day before as the same boxes that contained the counterfeit "COTTON HERITAGE" t-shirts that he saw at West Side Socks. *Id.* The West Side Socks representative confirmed that this was the second delivery of the counterfeit "COTTON HERITAGE" t-shirts from Tip Top Tees. *Id.* Mr. Ali personally observed an Asian female, a representative of Tip Top Tees, unloading boxes of what he believed to be counterfeit "COTTON HERITAGE" t-shirts. *Id.*

On or about the week of March 17, 2008, a customer who regularly purchases t-shirts from Mr. Paul and Plaintiff, informed Mr. Ali that Mr. Paul boasted to him that he was underselling Roochi with Counterfeit Products, laughing that there was nothing Plaintiff could do to stop the illegal activity. *Id.* at ¶ 14. On or about the week of March 17, 2008, Mr. Ali has been contacted by numerous distributors and customers who have been asking for a discounted rate due to Tip Top Tee flooding the U.S. market from Florida to New York to Ohio with Counterfeit Products, which appear to be selling for $15-18 a dozen which $4-7 less than the price of genuine COTTON HERITAGE t-shirts, a substantial amount when selling 1800 dozen (e.g., a savings of $7,200 -12,600). *Id.* ¶ 15. Many of the Roochi distributors are frustrated because their customers are buying Counterfeit Products from Tip Top Tees under the false assumption that they are purchasing authentic goods. *Id.* ¶ 15.

On or about March 27, 2008, Mr. Ali was contacted by a Roochi distributor who informed Mr. Ali that some of his customers in Ohio were complaining about being charged the standard price, $22 a dozen, for COTTON HERITAGE branded t-shirts, when they were getting

offers from Tip Top Tees who was selling "COTTON HERITAGE" t-shirts as low as $15 a dozen. *Id.* ¶ 17. The distributor was very upset because he claimed that it is difficult for him to sell the authentic COTTON HERITAGE t-shirts in a market flooded by cheaper counterfeit goods. *Id.* Tip Top Tees' importation, distribution, and sales of the Counterfeit Products are destroying Roochi's relationships with its distributors and customers and causing actual confusion as to the source of COTTON HERITAGE products. *Id.* ¶ 9, 15, 17. Moreover, the lesser or unknown quality of the Counterfeit Products has caused and is causing irreparable damage to the COTTON HERITAGE brand. *Id.*

Plaintiff did not authorize Tip Top Tees, Inc., Glamour Line Inc., Glamour (USA), Inc., Alpha Merchandising Corp., Rose Deal, Inc., Haryash Paul, Mohammed Rahman, nor Mohammed Faroque (collectively, "Defendants") to manufacture, distribute, or sell any shirts bearing a counterfeit reproduction of the COTTON HERITAGE label. *Id.* ¶ 18.

Thereafter, Plaintiff promptly contacted counsel who began investigating the allegations. Specifically, on March 27, 2008, Miguel Sampaio ("Sampaio"), a private investigator retained by Plaintiff's counsel, went to Defendant Tip Top Tee's showroom, the 10 West 28th Street location, to purchase Counterfeit Products.[2] While there he observed a stack of Counterfeit Products, a Tip Top Tees' representative would not sell them to him because they were "dirty". Sampaio Decl. ¶ 7. Mr. Sampaio informed the Tip Top Tee's representative that he would be back the next day to pick up the t-shirt order that he needed. Mr. Paul has been increasingly evasive and guarded about the Counterfeit Products, claiming to Mr. Sampaio that the "COTTON HERITAGE" t-shirts were causing him trouble. *Id.* Mr. Sampaio continues in establishing a business relationship with Mr. Paul so that he will fulfill a sizeable purchase of the

---

[2]    *See* Declaration of Miguel Sampaio ¶ 7, dated April 9, 2008 ("Sampaio Decl.").

Counterfeit Products as this may be the only means to locate the bulk of the Counterfeit Products. *Id.* Mr. Paul informed Mr. Sampaio that he receives containers delivered to him directly from overseas manufacturers. *Id.* Based on an investigation of Rose Deal,[3] it appears that Rose Deal is involved in the operations to import, distribute and/or sell the Counterfeit Product. *Id.* ¶ 8; Ali Decl. ¶ 8. Accordingly, Mr. Sampaio is trying to establish a relationship with Rose Deal to order the Counterfeit Products. Sampaio Decl. ¶ 8. However, Rose Deal's representative has been extremely guarded. *Id.*

In short, Plaintiff has examined representative samples of Defendants' Counterfeit Products and determined it was a counterfeit of Plaintiff's Products. Ali Decl. ¶¶ 8-9. In any event, Defendants continue to traffic in sizable amounts of Counterfeit Products which justifies the issuance of a temporary restraining order, a preliminary injunction, a seizure order and expedited discovery. Sampaio Decl. ¶ 7.

Plaintiff did not authorize Defendants' sale of the Counterfeit Products. Ali Decl. ¶ 18. Defendants' Counterfeit Products are not genuine products manufactured by or for Plaintiff and Plaintiff did not inspect, package or approve the Counterfeit Products for sale or distribution. *Id.* Plaintiff is not missing any shipment of its genuine COTTON HERITAGE t-shirts. *Id.* Defendants are continuing to offer the Counterfeit Products and will continue to do so unless restrained by this Court.


## ARGUMENT

## I.     PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

[3]     Declaration of Stephen G. Ward ¶ 7, dated April 9, 2008 ("Ward Decl.").

**A.    Plaintiff Is Entitled To A Temporary Restraining Order**

In entering a temporary restraining order *ex parte,* the Second Circuit Court of Appeals in *In re Vuitton et Firs S .A.*, 606 F.2d 1, 3-4 (2d Cir. 1979), observed that such orders serve the "'underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing'" (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 439 (1974)).  Furthermore, "'[i]n a trademark infringement case ... a substantial likelihood of confusion constitutes, in and of itself, irreparable injury" sufficient to satisfy the requirements of Rule 65(b)(1).  *Gucci Am., Inc. v. Loehmann's Inc.,* No. 01 Civ. 3904 (MBM), 2001 U.S. Dist. LEXIS 19358, at *2 (S.D.N.Y. Nov. 27, 2001) (quoting In *re Vuitton et Fils S.A.*, 606 F.2d at 4).  Courts readily issue preliminary relief once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, as amended (the "Lanham Act") is demonstrated.  Courts base this relief on the trademark holder's "inability to control the nature and quality of the infringer's goods . . . ."  *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862 (7th Cir. 1983); *accord El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1992), *aff'd* 37 F.3d 74 (2d Cir. 1994 ("actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain").

Plaintiff seeks a temporary restraining order for precisely the reasons such orders are customarily entered: to maintain the status quo in this case pending a hearing on Plaintiff's request for a preliminary injunction by preventing Defendants from disposing of their inventory of Counterfeit Products and to prevent the public confusion that is occurring and is certain to continue if Defendants are permitted to pursue their illegal activities unabated and undeterred.

**B.    Plaintiff Is Entitled To A Preliminary Injunction**

In this Circuit, preliminary injunctive relief is available upon a showing of (a) likely irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious

questions going to the merits, coupled with a balance of hardships tipping decidedly in the movant's favor. *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994); *Firma Melodiya v. ZYX Music GmbH*, 882 F.Supp. 1306, 1311 (S.D.N.Y. 1995).

The record in this case amply supports Plaintiff's request for injunctive relief under either test.

### 1.  Plaintiff Will Suffer Irreparable Harm If Defendants Are Not Preliminarily Enjoined

The probability of public confusion as to the source or sponsorship of Defendants' Counterfeit Products is, itself, irreparable harm. *Church of Scientology Int'l. v. Elmira Mission*, 794 F.2d 38, 41 (2d Cir. 1986). Thus, the right to a preliminary injunction follows from a *prima facie* showing of plaintiff's likelihood of success on the merits of its trademark claims. *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F. Supp. 980, 990 (S.D.N.Y. 1980):

> There is no question that irreparable harm would result from a failure to enjoin if the plaintiff ultimately succeeds on the merits."
> *Amer. Home Products v. Johnson Chemical Co.,* 589 F.2d 103, 106 (2d Cir. 1978).

This is because a trademark owner has the right to control the use of its trademark and the goodwill that its trademark symbolizes. *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259-60 (2d Cir. 1987). This Court has held that, with respect to trademark infringement claims, "irreparable harm may be presumed upon a showing that [plaintiff's] trademark is protectable and that a likelihood of confusion exists as to the ownership or source of goods in question." *Firma Melodiya*, 882 F. Supp. at 1311.

As set forth below, Plaintiff can demonstrate that it owns a valid and protectable trademark and that a likelihood of confusion will result from Defendants' sale of the Counterfeit Products. It follows that Plaintiff will be irreparably harmed by Defendants' sale of their

11

Counterfeit Products. *See Firma Melodiya*, 882 F. Supp. at 1311. Plaintiff has additionally met the irreparable harm element necessary to obtain a temporary restraining order.

The sale of Counterfeit Products bearing Plaintiff's Trademark will cause irreparable harm to Plaintiff. Because counterfeit COTTON HERITAGE t-shirts are of less or unknown quality and are substantially less expensive than genuine COTTON HERITAGE t-shirts, the sale of the Counterfeit Products detracts from the sale of genuine COTTON HERITAGE t-shirts. Ali Decl. ¶¶ 5, 8, 15.

### 2.    Plaintiff Is Likely To Succeed On The Merits

In order to prevail on its claims for trademark infringement and counterfeiting, and unfair competition under the Lanham Act and at common law, Plaintiff must prove, *inter alia*: (1) Plaintiff's Trademark is entitled to protection; and (2) there is a likelihood of confusion between Defendants' Counterfeit Products and Plaintiff's Trademark as used or intended to be used in the marketplace. *See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 489-90 (2d Cir. 1988)

The record submitted in support of this application plainly shows that Plaintiff should prevail on both of these points.

### a.    Ownership

There can be no dispute that Plaintiff owns the trademark that is the subject of this action and that this mark is distinctive. The COTTON HERITAGE trademark for apparel, specifically, t-shirts, is nationally recognized, as evidenced by Plaintiff's widespread sale of apparel bearing Plaintiff's Trademark. *See* pp. 4-5, *supra*. Moreover, pursuant to Sections 15 and 33(b) of the Lanham Act, 15 U.S.C. §§ 1065, 1115(b), Plaintiff's registration of its COTTON HERITAGE trademark has become incontestable, and is conclusive evidence of the validity of the registered

mark and of the registration of the mark, of Plaintiff's ownership of the mark and of Plaintiff's exclusive right to use that mark in commerce. Further, Plaintiff has used and are currently using Plaintiff's Trademark in commerce and in connection with its sale of Plaintiff's Products, and plan to continue such use in the future. Ali Decl. ¶ 4-5. Plaintiff's evidence amply demonstrates a likelihood that it will prevail on this first element of its claims for trademark counterfeiting and infringement, and unfair competition under the Lanham Act and at common law.

### b.    Likelihood Of Confusion

Standing alone, Defendants' importation, distribution, offering for sale and sale, of t-shirts bearing Plaintiff's Trademark that do not originate with and are not authorized by Plaintiff, establishes Plaintiff's likelihood of success on the merits and right to preliminary injunctive relief. *Power Test Petroleum Distribs. v. Calcu Gas*, 754 F.2d 91, 94-95 (2d Cir. 1985).

Moreover, a person who reproduces and uses a plaintiff's registered trademark in commerce on the same goods sold by the plaintiff without consent of the registrant shall be liable for infringement where, as in this case, confusion necessarily results. *Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*, 714 F. Supp. 78, 79 (S.D.N.Y. 1989).

Finally, Plaintiff's likelihood of success is apparent from an analysis of the factors traditionally considered in determining whether confusion is likely, which include:

> (1) the strength of the plaintiff s mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the comparative proximity of the services; (4) the likelihood that plaintiff will "bridge the gap" and offer a service like defendants; (5) actual confusion; (6) good faith on the defendant's part; (7) the quality of the defendant's service; and (8) the sophistication of the buyers.

*Empresa Cubana Del Tabaco v. Culbro Corp.*, 70 USPQ2d 1650, 1683 (S.D.N.Y. 2004).

### i.    Strength Of Plaintiff's Marks

As discussed at pages 5, *supra,* the strength of Plaintiff's COTTON HERITAGE trademark for apparel is strongly evidenced by its sales and the recognition that COTTON HERITAGE branded apparel has achieved in the marketplace and among the trade. Plaintiff's rights in its trademarks are recognized by the United States Patent and Trademark Office, which issued the registration set forth in paragraph 6 of the Ali Declaration, for apparel, including t-shirts. Plaintiff's registered rights extend to the very goods being sold by Defendants, namely, counterfeit "COTTON HERITAGE" t-shirts.

### ii.    Defendant's Intent

Although Plaintiff is not required to prove that Defendants intended to violate Plaintiff's rights, *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.,* 217 USPQ 617, 620 (S.D.N.Y. 1982), where defendants' bad faith is shown, it is strong evidence of likelihood of confusion. *Glamorene Prods. Corp. v. Boyle-Midway, Inc.*, 188 USPQ 145, 166 (S.D.N.Y. 1975) (collecting Second Circuit cases).

In this case, defendants' bad faith could not be more clear. Without acquiring or even attempting to acquire permission to use Plaintiff's COTTON HERITAGE trademark, Defendants' manufactured, distributed, offered for sale and sold counterfeit and infringing "COTTON HERITAGE" t-shirts. *See pp.* 5-9, *supra.* Moreover, it is alleged that Mr. Paul has bragged to one of Plaintiff's customers about his illegal activities, amused that Plaintiff would be powerless to stop such activities. Ali Decl. ¶ 14.

If there is a showing that Defendants intended to copy Plaintiff's Trademark, "likelihood of confusion will be presumed as a matter of law." *N.Y. State Soc'y Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F.Supp. 2d 331, 340 (S.D.N.Y. 1999), citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d at 258. "If the junior user has 'adopted the

mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement.'" *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987). Thus, the issue to be determined by this factor is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 131 (S.D.N.Y. 1993). Courts will infer intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired a secondary meaning." *Id.* at 132.

### iii.    Similarity Between Marks And Products

Palming off one's products as those of another has long been regarded as the essence of trademark infringement. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 412-13 (1916); *Franchised Stores of N.Y., Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir. 1968) (citation omitted):

> The evil sought to be remedied in the trademark infringement
> action is that of "passing off" -- the "sale of anther's goods as those
> of the trade-mark owner by use of the owner's mark."

So serious is such conduct that the use of another's mark on products for which the mark is federally registered constitutes counterfeiting in violation of 15 U.S.C. § 1116(d) and is a criminal offense under 18 U.S.C. § 2320. In this case, Defendants have affixed to t-shirts the COTTON HERITAGE Trademark that is the subject of Plaintiff's federal registration for the exactly the same product. Ali Decl. ¶ 9. Defendants' Counterfeit Products prominently display an identical label as Plaintiff's Products. *Id.*

Wholly apart from Plaintiff's rights flowing from its federal registration, Defendants' activities infringe Plaintiff's common law rights in its COTTON HERITAGE Trademark by creating a likelihood of confusion as to Plaintiff's sponsorship of Defendants' Counterfeit Products. *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 329 (2d Cir. 1983).

### iv.    Bridging the Gap

Bridging the gap involves an analysis of the likelihood that the senior user will enter the junior user's market. *See Lexington Management Corp. v. Lexington Capital Partners*, 10 F. Supp.2d 271, 287 (S.D.N.Y. 1998). Where the parties sell identical products, "there is no gap to bridge [and] this factor strongly favors plaintiffs." *Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp.2d 188, 198 (S.D.N.Y. 1999).

### v.    Actual Confusion and
### Sophistication of Purchasers

Defendants' Counterfeit Products are causing instances of actual confusion. Ali Decl. ¶ 9. Indeed, a long-time customer of Plaintiff was confused as to why Defendant Tip Top Tees was selling Plaintiff's COTTON HERITAGE t-shirts (which were in fact Counterfeit Products). *Id.* Moreover, Plaintiff has recently been contacted by several customers and distributors inquiring why the COTTON HERITAGE t-shirts are being sold at an unusually low price. *Id.* ¶ 15. *See Fun-damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1003 (2d Cir. 1997) (upheld preliminary injunction against defendants because, *inter alia*, plaintiff's national sales manager demonstrated actual confusion by testifying that some of plaintiff's retail customers complained because they thought that plaintiff was selling at a lower price to other retailers). Like *Fun-damental Too*, Defendants' Counterfeit Products, which are flooding the relevant marketplace, are causing similar instances of actual confusion, e.g., Plaintiff's customers have contacted Plaintiff to find out why Plaintiff is selling its genuine COTTON HERITAGE t-shirts for lower prices to other customers. Ali Decl. ¶ 15. Indeed, Plaintiff's distributors are frustrated because their customers are buying Counterfeit Products from Tip Top Tees under the false assumption that they are purchasing geniune COTTON HERITAGE t-shirts. *Id.* ¶ 15.

Whether or not Plaintiff's buyers and ultimate consumers can distinguish between original and counterfeit Plaintiff's Products does not prevent these consumers from being negatively affected by Defendants' Counterfeit Products. As this court has noted, "[w]hile Defendants claim that customers of Cartier watches are 'sophisticated,' to the extent that they would not be confused by the counterfeit t-shirts, Cartier faces the palpable loss of goodwill once consumers perceive the 'cheapening' and dilution of the brand." *Cartier v. Symbolix, Inc.*, 2005 WL 1330786, *6 (S.D.N.Y. June 2, 2005).

### vi.    Quality of Defendants' Product

When the defendant's product is inferior, this factor weighs in favor of the plaintiff. *See Consolidated Cigar Corp.*, 58 F.Supp. 2d at 199. The renown of Plaintiff's Trademark within the trade is due primarily to Plaintiff's commitment to providing quality goods and dealing fairly with its customers. Ali Decl. ¶ 4. The Counterfeit Products are of inferior or unknown quality. Ali Decl. ¶ 10. More importantly, however, the "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d. Cir.), *amended reported at* 1992 U.S. App. LEXIS 32201 (2d Cir. 1992), *aff'd* 37 F.3d 74 (2d Cir. 1994). Customers return to Plaintiff to purchase genuine COTTON HERITAGE t-shirts because they know the t-shirt will wash well and retain heat transfer printing designs well. *Id.* ¶ 4.

It follows that Plaintiff can demonstrate a strong likelihood of confusion because all the factors set forth above favor Plaintiff.

### 3.    The Balance of Hardships
### Tips Decidedly in Plaintiff's Favor

Plaintiff has established the requisite likelihood of success as to Defendants' liability for trademark counterfeiting and infringement under the Lanham Act, as well as Plaintiff's related

17

state claims. However, should this Court not find such likelihood of success on the merits, Plaintiff respectfully submits that it has at least raised serious questions going to the merits of its claims against Defendants, and that the balance of hardship tips decidedly in Plaintiff's favor. As discussed at pages 4-9, *supra,* Plaintiff will suffer irreparable harm to its Trademark, to its reputation and to its goodwill if Defendants are not enjoined. On the other hand, Defendants will not suffer any harm which should be considered in deciding whether to award preliminary injunctive relief. Defendants have no legitimate business interest in the importation, distribution, offering for sale and sale of Counterfeit Products. Their present "predicament is of [their] own making." *Syntex Labs., Inc. v. Norwich Pharmacal Co.,* 315 F. Supp. 45, 57 (S.D.N.Y. 1970), *aff'd,* 437 F.2d 566 (2d Cir. 1971).

For the same reasons that Plaintiff is likely to prevail on its claims, Plaintiff has raised serious questions for which there is a fair ground for litigation. Accordingly, this Court must balance Plaintiff's harm from the wrongful denial of a temporary restraining order and preliminary injunction against any harm Defendant may suffer from granting an injunction that would not be cured by prevailing on the merits and recovering on Plaintiff's injunction bond.

As set forth in greater detail above, the harm to Plaintiff is irreparable. The continued unauthorized use of the Plaintiff's Trademark further threatens Plaintiff's reputation because Plaintiff will lose control over the quality and appearance of its products, which will ultimately destroy the value of Plaintiff's Trademark as a designation of source. In stark contrast, the potential harm is exclusively monetary. There is no justification for selling the Counterfeit Product or otherwise using Plaintiff's Trademark without Plaintiff's authorization. Indeed, given "the probable outcome of this action, this is a loss which [defendants] may justifiably be called

upon to bear." *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

Balancing the slight potential for monetary harm to Defendants against the irreparable harm to Plaintiff's goodwill and reputation established through years of fair dealing and selling Plaintiff's Products of known quality, and the disastrous long-term effects of unfettered infringement and counterfeiting on Plaintiff's business, demonstrates that the harm to Plaintiff outweighs the harm to Defendant. *See, e.g., Lesportsac, Inc. v. K-Mart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985) ("the potential damage to Lesportsac's mark and goodwill in the absence of a preliminary injunction outweighs the short-term economic harm that K-mart may suffer"), *abrogated on other grounds by Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

## II.  PLAINTIFF IS ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

Recognizing that the sale of counterfeit merchandise was a serious problem for trademark owners and a threat to the public, Congress amended the Lanham Act in 1984 to permit the granting of *ex parte* orders for the seizure of counterfeit merchandise.  To facilitate the preservation of evidence, the statute authorizes the *ex parte* seizure of "goods and counterfeit marks involved in such violation and the means of making such marks, and records documents the manufacture, sale, or receipt of things involved in such violation."  15 U.S.C. § 1116(d)(1)(A).  Congress's purpose in providing for *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters served with a civil summons from disappearing or quickly disposing of existing inventory of counterfeit items and the records relating to their manufacture and distribution. Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* seizure order is appropriate upon a showing that: (i) the person obtaining the order will provide adequate security; (ii) an order other than an *ex parte* seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant is likely to succeed in showing the defendant used a counterfeit mark; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendant, the defendant or persons acting in concert with defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court. *See* 15 U.S.C. § 1116(d)(4)(B).

A preliminary injunction is insufficient in cases, such as the instant one, involving counterfeiting. Without the remedy of an *ex parte* temporary restraining order and seizure, this lawsuit will be an exercise in futility. Courts comprehending the unfortunate reality of this situation, the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, now regularly issue *ex parte* seizure orders. *See, e.g., Antik Demin LLC v. Da Urban Hut et al.*, No. 05 CV 10077 (JFK) (S.D.N.Y. Dec. 12, 2005); *North Face Apparel Corp. v. TC Fashions, Inc.*, No. 05 CV 9082 (S.D.N.Y. Oct. 25, 2005); *North Face Apparel Corp. v. Reliance Dep't Store, Inc.*, No. 03 CV 9596 (BSJ) (S.D.N.Y. Dec. 3, 2003); *Cartier Int'l B.V. v. Sam Liu*, No. 02 CV 7926, 2003 WL 1900852 (S.D.N.Y. Apr. 17, 2003); *Fila U.S.A., Inc. v. Top Luxor Trading*, No. CV 98-5187 (C.D. Cal. June 29, 1998); *Reebok Int'l Ltd. v. McLaughlin*, 89 Civ. 1739-T (S.D. Cal. Nov. 27, 1989); *Reebok Int'l Ltd. v. Marnateh Enters., Inc.*, 737 F. Supp. 1521 (S.D. Cal. 1990); *Fila U.S.A., Inc.*

*v. Eidai Int'l*, No. CV 93-00837 (D. Haw. Oct. 29, 1995); *Reebok Int'l Ltd. v. Fairgulf Int'l Shipping & Trading, U.S.A., Inc.*, No. 93 Civ. 391 (W.D. Tex. Sept. 28, 1993); *Cartier Int'l v. Gorski*, No. 301 CV 1948 (PCD) (D. Conn. Oct. 17, 2001), cases attached as Declaration of Mimi K. Rupp, dated April 10, 2008 ("Rupp Decl.") Ex. B.

As discussed below, Plaintiff meets each of these requirements.

By letter dated April 3, 2008, Plaintiff gave notice to the United States Attorney for this judicial district of its intention to seek an *ex parte* seizure order. Rupp Decl. ¶ 8. Plaintiff has not publicized the requested seizure. Rupp Decl. ¶ 7. The items to be seized are located at a specific addresses and/or will be intercepted via Plaintiff's agents' purchase of a sizable amount from Defendants. Sampaio Decl. ¶¶ 7-8; Ward Decl. ¶¶ 3-5, 7. Plaintiff has further submitted evidence showing that the materials to be seized will be located at two business locations in New York. Ward Decl. ¶¶ 3-5, 7. The business records located at Defendants' New York offices are likely to reveal the sources of the Counterfeit Products and lead to the identification of all locations where Defendants are storing the Counterfeit Products. Given the nature of Defendants' counterfeiting activities and Mr. Paul's brazen boasts that Plaintiff is powerless to thwart such activities, an order other than an *ex parte* seizure order is not adequate to achieve the purposes of Section 32 of the Trademark Act (15 U.S.C. § 1114). On the contrary, Plaintiff will suffer immediate and irreparable injury if a seizure is not ordered. The reason for this is that if Plaintiff gives notice to Defendants, Defendants are likely to destroy, move, hide or otherwise make inaccessible to the Court the items to be seized. Defendants have the capability to destroy, move, hide or otherwise make inaccessible the items to be seized. The Second Circuit has recognized that giving notice in counterfeit cases may only "render fruitless further prosecution

of the action." *In re Vuitton et Fils S.A.*, 606 F.2d at 5. Defendants should not be permitted to escape here.

Finally, the harm to Plaintiff by denying this application outweighs any harm to the legitimate interests of Defendants by granting it. The irreparable harm to Plaintiff is well documented (pp. 4-9, *supra*), as is the risk that defendants will conceal, destroy, or otherwise make inaccessible to the Court their Counterfeit Products, and will destroy incriminating records. Weighed against these harms, Defendants can have no legitimate complaint if they are not provided an opportunity to evade the law by destroying evidence.

## III.   PLAINTIFF IS ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS

Plaintiff has shown a strong likelihood of succeeding on the merits of its trademark counterfeiting and infringement claims, and thus Plaintiff ultimately will be entitled to an equitable accounting of Defendants' profits from sales of Defendants' Counterfeit Products. 15 U.S.C. § 1117. In this regard, courts of several circuits have noted that a district court has the inherent power, under the Lanham Act, to issue an order restraining a defendant's assets so that a plaintiff's right to an equitable accounting is not later rendered meaningless. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992). Indeed, "the framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is ordinarily within the domain of the trial court," and that "every means of preventing continuance of deceptive practices is proper." *Levitt Corp. v. Levitt*, 593 F.2d 463, 469 n.10 (2d Cir. 1979) (citations omitted).

In the leading case of *Reebok v. Marnatech*, the district court granted Reebok a limited restraint of the defendant's assets for the purpose of preserving same to ensure the availability of

a meaningful accounting after trial. *Reebok Int'l Ltd.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd*

970 F.2d 552 (9th Cir. 1992). In affirming the lower court's decision, the Ninth Circuit held:

> Because the Lanham Act authorizes the District Court to grant
> Reebok an accounting of [defendant's] profits as a form of final
> equitable relief, the District Court has the inherent power to freeze
> [defendant's] assets in order to ensure the availability of that final
> relief.

*Reebok v. Marnatech*, 970 F.2d at 559; *see also Republic of Philippines v. Marcos*, 862 F.2d

1355, 1364 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989) ("A court has the power to issue a

preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve

the possibility of equitable remedies.").

Over the years following the *Marnatech* decision nearly all the federal courts have

granted the temporary restraint of assets to ensure a meaningful remedy in cases similar to this

one. A court has the inherent authority to freeze an alleged counterfeiter's assets to preserve the

possibility of that remedy. This Court can grant such restraint under Federal Rules of Civil

Procedure Rules 64 and 65, Sections 34 and 35 of the Lanham Act, and the Court's inherent

equitable power to issue provisional remedies ancillary to its authority to provide final equitable

relief. *Levi Strauss & Co.*, 51 F.3d at 986-87; *Marnatech*, 970 F.2d at 558-61.

In determining whether to issue an order restraining a defendant's assets, a plaintiff must

show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of

defendant's counterfeit activities; and (3) defendant's might hide its ill-gotten funds if its assets

were not frozen. *Marnatech*, 737 F. Supp. at 1524, 1527.

As demonstrated above, Plaintiff will likely succeed on the merits of its claims, is

incurring irreparable injury, and Defendants will likely hide their assets, rendering an accounting

meaningless. Plaintiff respectfully submits that the grant of an injunction restraining the likely transfer of Defendants' assets herein is proper.

## IV.    PLANTIFF IS ENTITLED TO EXPEDITED DISCOVERY

Orders granting expedited discovery are commonplace in trademark infringement and counterfeiting actions. District courts have broad powers to grant expedited discovery to allow plaintiffs to take early depositions and to require early document production when appropriate. Expedited discovery is warranted when plaintiff demonstrates:

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990) (quoting *Computerland Corp. v. Batac, Inc.*, No. 88 CV 8624 (SWK), 1988 U.S. Dist. LEXIS 14079, at *14 (S.D.N.Y. Dec. 16, 1988)).

As set forth at pages 11-21 *supra,* Plaintiff plainly satisfies the first two requirements, irreparable harm and probability of success on the merits. With respect to the third requirement, expedited discovery may well lead Plaintiff to (a) evidence of continuing counterfeiting and infringement of its Plaintiff's Trademark by Defendants, (b) future plans to counterfeit or infringe, (c) the discovery of additional counterfeit or infringing merchandise, and (d) the source of Defendants' counterfeit merchandise. Hence, a connection exists between the expedited discovery and the avoidance of the irreparable harm. *Twentieth Century Fox Film Corp.*, 749 F. Supp. at 475.

Regarding the fourth factor, hardship to Defendants, the information and materials sought from Defendants, as set forth in Plaintiff's [Proposed] Order, filed herewith, should all be within

Defendants' possession and control. Accordingly, the expedited discovery Plaintiff seeks, all of which is directly related to the merits of Plaintiff's preliminary injunction motion and the relief sought therein, is neither overly broad nor unduly burdensome. *Id.*

The discovery requested on an expedited basis in Plaintiff's proposed temporary restraining order has been precisely defined and cautiously restricted to encompass only that which is essential for the preliminary injunction. Discovery of Defendants' import and distribution of the Counterfeit Products and unauthorized use of the Plaintiff's Trademark will allow Plaintiff to access a full and accurate detailing of Defendants' infringing activities. Accordingly, Plaintiff needs to obtain copies of shipping, import and export documents, including bills of lading, purchase orders, and certificates of origin to discover details regarding (1) pending shipments and (2) the location of the Counterfeit Products that are sold and shipped by Defendants and/or have already been exported and distributed throughout the United States. Moreover, the proposed temporary restraining order includes a protective order concerning any documents seized or copied by Plaintiff, thus protecting Defendants from improper disclosure thereof pending a further hearing by this Court.

The rationale for granting expedited discovery in counterfeiting cases has been stated in *Fimab-Finanziaria Maglificio v. Helio Import/Export,* 601 F. Supp. 1, 3 (S.D. Fla. 1983):

> Plaintiffs also seek immediate discovery prior to a preliminary injunction hearing, to determine the source, magnitude, and distribution of the counterfeit FILA goods. Expedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time. *Gibson v. Baqas Restaurants*, 87 F.R.D. 60, 62 W.D. Mo. 1980). Such relief may be granted *ex parte. See K J Schwartzbaum, Inc. v. Evans, Inc.*, 279 F. Supp. 422, 424 (S.D.N.Y. 1968). Such prejudice is frequently the case where a well-known trademark, such as Plaintiffs here, has been counterfeited and the sources or purchasers of the counterfeit products are unknown to plaintiff.

The foregoing rationale is squarely applicable to this case, in which Plaintiff will be unable to determine the source, magnitude or distribution of Defendants' Counterfeit Products prior to any hearing on its preliminary injunction motion without expedited discovery.

Plaintiff is unaware of any reason why Defendants cannot comply with these request without undue burden. More important, as stated in the supporting declarations, Defendants have engaged in numerous deceptive practices that foretell that Plaintiff may lose the opportunity for meaningful discovery concerning the requested relief. Accordingly, the request for expedited discovery should be granted.

## CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests that this Court grant an order temporarily restraining Defendants their Counterfeit Products or any unauthorized use of Plaintiff's Trademark, an order of seizure, an order restraining assets, an order for expedited discovery and an order to show cause for preliminary injunction.

KENYON & KENYON LLP

Dated: April 10, 2008                          By

Michelle Mancino Marsh (MM 1494)
Mimi K. Rupp (MR 0007)
One Broadway
New York, New York 10004
Tel.: (212) 425-7000
*Attorneys for Plaintiff*
Roochi Traders Incorporated